IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT D. GERSTEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 C 5403 |
| | ) | |
| | ) | Judge Mark Filip |
| INTRINSIC TECHNOLOGIES, LLP, | ) | |
| THOMAS LAMANTIA, AND | ) | |
| RICHARD P.L. SCHENDELMAN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants, Intrinsic Technologies, LLC ("Intrinsic" or "Company"), Thomas LaMantia

("LaMantia"), and Richard P.L. Schendelman ("Schendelman") (collectively "Defendants"),

have moved to stay proceedings pending arbitration pursuant to the stay provision of the Federal

Arbitration Act, 9 U.S.C. § 3. (D.E. 14.)[1] For the reasons stated below, the motion is granted.

## BACKGROUND

Intrinsic is an information technology consulting company that was founded by LaMantia

and Schendelman in 1997. (D.E. 8 (1st Am. Cmplt.) ¶ 14; D.E. 13 ¶ 3, 15.) In January 1999,

Lamantia and Schendelman, along with Patrick Fisher ("Fisher") and Michael Gersten

("Michael"), Plaintiff's son, executed a "First Amended Operating Agreement" ("Operating

Agreement") to define the "terms and conditions governing the management, operation and

affairs" of Intrinsic. (D.E. 8, Ex. A at 1.) Under the agreement, and in recognition of their

---

[1]  "D.E." refers to the docket entry of the cited document, followed by the appropriate page or
paragraph number.

"valued contribution of services," Fisher and Michael were made "Members" of Intrinsic and each acquired a 15% "Interest" in the company. (*Id.* at 1.)[2] After the Operating Agreement was executed, LaMantia and Schendelman each retained a 35% ownership interest in Intrinsic. (*Id.*)

Under the Operating Agreement, "Interest Holder means either a Member or an Economic Interest Owner who holds an Economic Interest." (*Id.* at 2.) An Economic Interest includes "a share of a Member or an Economic Interest Owner in the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this [Operating] Agreement . . . ." (*Id.*) A "Membership Interest" includes the Member's Economic Interest, as well as the right to participate in the management and affairs of Intrinsic. (*Id.*) Each of the initial four Members in Intrinsic (*i.e.*, Lamantia, Schendelman, Fischer and Michael Gersten, Plaintiff's son) held both a Membership Interest and an Economic Interest. (*Id.* at 1.) Under the Operating Agreement, succession to an Economic Interest will be accompanied by admission as a Member only upon "unanimous consent of the then-current Members" (*id.* at 10); in the absence of such unanimity, the transferee acquires simply the Economic Interest of the former-Member. (*Id.*) An Economic Interest Holder has other rights specified in the Operating Agreement (*see, e.g.*, Section 5.4 (right to certain annual monetary distributions), Section 6.6 (right to inspect Company books and records))—which rights Plaintiff attempts to invoke in this dispute, as discussed at length below. Under the Operating Agreement, no Economic Interest Holder or Member may transfer his or her interest absent compliance with the terms and conditions of the Operating Agreement. (*See, e.g.*, *id.* at 9-10).

---

[2]    The Operating Agreement defines a "Member" as "each Person signing this Agreement and any person who is subsequently admitted as a member of the Company." (D.E. 8, Ex. A at 2.)

The Operating Agreement also specifically addresses many of Instrinsic's affairs and business activities, and contains sections titled: "Formation of the Company;" "Management: Rights, Powers and Duties;" "Capital Contributions and Accounts;" "Profit, Loss, and Distributions;" "Accounting and Tax Matters; Books and Records of the Company;" and "Transfer of Interests," among others. (*Id., passim.*) In addition, the Operating Agreement contains an arbitration clause that states, in pertinent part, "All disputes arising under or in connection with this Agreement shall be resolved and disposed of by arbitration in Glen Ellyn, Illinois, in accordance with the commercial arbitration rules of the American Arbitration Association." (*Id.* at 15.)

In 2003, Fisher left Intrinsic and, it appears, the Company recovered his 15% membership interest in exchange for some $260,000. (D.E. 13 at 7.[3]) As a result, after Fisher's departure, Michael owned a 17.65% interest in Intrinsic while Lamantia and Schendelman each owned a 41.175% interest. (D.E. 13 ¶ 23.)

In January 2004, after allegedly working for the Company for many months without pay, Michael notified Defendants of his intent to sell his Economic Interest in Intrinsic to his father, Plaintiff here. (D.E. 13 at 7; D.E. 8, Ex. B.) On February 2, 2004, Intrinsic made a conditional offer to purchase Michael's interest, which he rejected. (D.E. 13 at 8.) According to Plaintiff, on February 18, 2004, Defendants claimed that they were exercising a "right of first offer to

---

[3]    The exact particulars of the purchase arrangement are disputed. While these disputes may ultimately be material to the underlying merits of the claims at issue, the disputes are not material to the question of whether arbitration is appropriate. *Accord, e.g., Hawkins v. Aid Assoc. For Lutherans*, 338 F.3d 801, 807 (7th Cir. 2003) ("In analyzing a motion to compel arbitration, courts must consider only the issues relating to arbitrability.") (citation omitted). Once the Court determines that arbitration is appropriate, the underlying merits of the substantive claims are "for the arbitrator to decide." *Id.* (citing, *inter alia, Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967)).

purchase" Michael's interest, as provided by Sections 7.6(b), 7.1(b)(iii), and 7.1(b)(ix) of the Operating Agreement. (*Id.*) Plaintiff further contends that this right was ill-asserted: according to Plaintiff, "Section 7.6(b) of the . . . Operating Agreement was not applicable to Intrinsic's right of first offer because, inter alia, Section 7.5 of the . . . Operating Agreement (containing right of first refusal provisions) controlled." (*Id.* at 9.) As a result, Plaintiff contends, he successfully purchased his son's Interest in the Company in March 2004 for $550,000. (*Id.* at 10.) In this regard, Plaintiff asserts that, "pursuant to Section 10.1 and 7.5(e) of the . . . Operating Agreement," he gave the requisite written notice to Defendants of his purchase of his son's Economic Interest in Intrinsic. (*Id.* at 11.) Plaintiff asserts that Defendants have wrongly refused to recognize his acquisition. (*Id.* at 10-12.) Defendants, in turn, deny that Plaintiff has acquired any ownership interest in Intrinsic as he contends. (*Id.* at 12.)

Count I of the First Amended Complaint seeks a declaratory judgment that Plaintiff is "the legal owner of a 17.65% Economic Interest in Intrinsic Technologies, LLC," for the reasons outlined above. (D.E. 8 at 13.) In support of Count I, Plaintiff claims that his son validly transferred his Economic Interest to Plaintiff pursuant to the terms of the Operating Agreement. (*Id.*) In addition, Plaintiff asserts that Defendants have wrongly denied him his rights under "Section 6.6 of the . . . Operating Agreement [, which] provides that the 'books and records of the Company shall be available, upon reasonable advance notice, for inspection and copying by any Interest Holder.'" (*Id.* at 12 (quoting Operating Agreement).) Plaintiff also contends that Defendants have violated "Section 5.4 of the . . . Operating Agreement [, which] provides that Intrinsic shall make cash distributions to each Interest Holder sufficient to pay the federal and state tax liability incurred by such Interest Holder and that such distributions shall be made" by

March 15 of each calendar year, by not making appropriate annual cash distributions to Plaintiff. (*Id.* at 12 (quoting Operating Agreement).)

In Count II, Plaintiff alleges "Breach of Fiduciary Duties" by Lamantia and Schendelman. (D.E. 8 at 13-14.) Plaintiff claims that the two individual Defendants violated this fiduciary duty to him by, *inter alia*, failing "to abide by the terms of the . . . Operating Agreement." (*Id.* at 14.) In this regard, Plaintiff asserts that Lamantia and Schendelman also have violated their fiduciary duties to him because they "excluded [Plaintiff] from all information regarding Intrinsic, including information [Plaintiff] is entitled to review and/or receive pursuant to Sections 6.6 and 6.7 of the . . . Operating Agreement." (*Id.* at 13.)

In Count III, Plaintiff seeks an accounting as against all Defendants. He claims a right to such an accounting "pursuant to Sections 6.6 and 6.7 of the . . . Operating Agreement." (*Id.* at 15.)

Defendants assert that this lawsuit must be submitted to arbitration pursuant to the Operating Agreement's arbitration clause because Plaintiff's suit attempts to assert rights fundamentally arising under and predicated upon that agreement. (D.E. 15 at 1-2.) Plaintiff replies that because he is not a signatory to the Operating Agreement, the Operating Agreement's arbitration clause should not apply to him.

DISCUSSION

I.      Application and Standards of the Federal Arbitration Act

Defendants brought this motion to stay proceedings pending arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3. (D.E. 15 at 3). Plaintiff does not dispute that the FAA applies.

5

The FAA provides that:

> [i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

The purpose of the FAA is to "reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991) (collecting cases). Before a court can stay proceedings in favor of arbitration, it must decide whether the proceeding is "referable to arbitration" in accordance with the FAA. 9 U.S.C § 3.

When a court determines whether a case should be stayed and/or referred to arbitration, precedent teaches that the court "must consider only the issues relating to arbitrability." *Hawkins v. Aid Assoc. For Lutherans*, 338 F.3d 801, 807 (7th Cir. 2003) (citing *We Care Hair Dev., Inc. v. Engen*, 180 F.3d 838, 844 (7th Cir. 1999)). Put differently, the court merely determines whether the underlying substantive disputes are, under the law, properly resolved in arbitration; if so, whether the various underlying claims and defenses are meritorious or not is not the subject of the court's analysis. *See, e.g., Hawkins*, 338 F.3d at 807 (citing, *inter alia, Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967)). "Arbitration is contractual by nature—a party cannot be required to submit to arbitration any dispute which he has not agreed

so to submit." *Zurich American Ins. Co. v. Watts Industries, Inc.*, 417 F.3d 682, 687 (7th Cir. 2005) (internal punctuation and citations omitted). As the Seventh Circuit has taught, however, "[t]hat said, there are five doctrines through which a non-signatory can be bound by arbitration agreements entered into by others: (1) assumption; (2) agency; (3) estoppel; (4) veil piercing; and (5) incorporation by reference." *Id.* (citing *Fyrenetics (H.K.) Ltd. v. Quantum Group, Inc.*, 293 F.3d 1023, 1029 (7th Cir. 2002); *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 352 (2d Cir. 1999)).

II.     The Arbitration Clause at Issue Covers The Substance of Plaintiff's Claims

One of the issues that must be analyzed in assessing whether arbitration is appropriate is whether the relevant arbitration clause is broad enough to cover the disputes at issue between the parties. In this case, Plaintiff does not assert that the arbitration clause in the Operating Agreement—which applies to "[a]ll disputes arising under or connection with" the Operating Agreement (D.E. 8, Ex. A at 15)—is not broad enough to cover the disputes at hand. (Plaintiff *does* dispute whether the clause can apply to him, but that will be discussed separately below.) Precedent is consistent with Plaintiff's implicit concession about the scope of the arbitration clause. Arbitration clauses like the one in the Operating Agreement are so broad that they have often been called "generic." *N. Illinois Gas Co. v. Airco, Indus. Gases, a Div. of Airco Inc.*, 676 F.2d 270, 275 (7th Cir. 1982) (so describing arbitration clause concerning "all disputes, claims and other matters in question arising out of, or relating to" the agreement); *accord, e.g., Oldroyd v. Elmira Savings Bank*, 134 F.3d 72, 76 (2d Cir. 1998) (collecting cases and referring to an arbitration clause concerning all claims "arising under or in connection with" an agreement as "the prototypical broad arbitration provision"); *Cecala v. Moore,* 982 F.Supp. 609, 613 (N.D. Ill.

7

1997) (similar; citing *Johnson v. Baumgardt*, 576 N.E.2d 515, 520 (Ill. App. Ct. 1991)). The law is clear that sweeping arbitration provisions of this type—if properly applied to the litigants at hand; again, more on that below—cover all disputes "having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract, *per se*." *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress, Int'l, Ltd.*, 1 F.3d 639, 642 (7th Cir. 1993). Plaintiff has not made an argument that his claims would not fall within the substantive scope of this broad language if arbitration between the parties is otherwise warranted. (D.E. 18-1). Therefore, there is no dispute that, if the Operating Agreement's arbitration provision is properly applied to Plaintiff, albeit against his preferences, it applies to the claims he brings here.

III.    Plaintiff Is Properly Required to Arbitrate

The Court therefore proceeds to the heart of the dispute—whether Plaintiff is required to arbitrate concerning his claims. As explained below, under Seventh Circuit precedent (and the precedent of sister circuits), Plaintiff is properly required to arbitrate the claims raised here.

In determining whether the parties have agreed to arbitrate, "courts generally . . . should apply ordinary state-law principles" governing contract formation. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). However, when it is undisputed that there is a valid contract such as the Operating Agreement, and the issue is whether that agreement applies to a non-signatory such as Plaintiff, federal precedent applying the FAA is applicable. *See, e.g., R.J. Riffin & Co. v. Beach Club Homeowners Ass'n, Inc.*, 384 F.3d 157, 160 n.1 (4th Cir. 2004) ("Because the determination of whether the Association, a nonsignatory, is bound by the general contract presents no state law question of contract formation or validity, we look to the federal substantive law of arbitrability to resolve this question.") (internal punctuation omitted) (citing

8

*Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417 n.4 (4th Cir. 2000) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 24 (1983)); *accord, e.g., Hoffman v. Deloitte & Touche, LLP*, 143 F. Supp. 2d 995, 1004 n.4 (N.D. Ill. 2001); *Eurosteel Corp. v. M/V MILLENIUM FALSON*, No. 01 C 8817, 2002 WL 1972266, *2 (N.D. Ill. Aug. 20, 2002) ("Whether parties have agreed to submit their claims to arbitration is a matter of contract interpretation that is determined by the courts. This determination is made by applying federal substantive law of arbitrability") (internal citation omitted); *Fujan Pac. Elec. Co. Ltd v. Bechtel Power Corp.*, No. C 04-3126 MHP, 2004 WL 2645974, at *3 (N.D. Cal. Nov. 19, 2004).

Defendants claim that the arbitration clause in the Operating Agreement, which provides that "[a]ll disputes arising under or in connection with this Agreement shall be resolved and disposed of by arbitration . . ." applies to Plaintiff's suit. (D.E. 15 at 4.) Plaintiff claims that because he is not a signatory to the Operating Agreement, the arbitration clause contained therein does not apply to him. (D.E. at 18-1 at 4 ("As a general rule, non-signatories to a contract containing an arbitration clause are not bound by the arbitration clause.").)

Plaintiff is certainly correct that, as a general proposition, non-signatories to an arbitration agreement are not required to arbitrate their disputes with signatories. *See Zurich American Ins. Co.*, 417 F.3d at 687. However, as the caveat "general" reflects, citation to this "general rule" does not conclude the arbitrability analysis. Because arbitration is borne of contract law, there are certain principles of contract law that federal courts have applied in compelling arbitration even when there is not a written arbitration agreement between the relevant parties. *Id.* The Seventh Circuit has recognized five doctrines of contract law through which a non-signatory can

9

be bound by arbitration agreements executed by others: (1) assumption; (2) agency; (3) estoppel; (4) veil piercing; and (5) incorporation by reference. *Id.* (collecting federal appellate citations).

As explained below, estoppel analysis (sometimes also referred to in federal precedent as equitable estoppel analysis) applies as to Plaintiff's claims in the instant case. His claims are all fundamentally rooted in and dependent on rights and conditions defined in the Operating Agreement. Put differently, Plaintiff's claims are not merely logically connected to the Operating Agreement, or indirectly related to it; to the contrary, he seeks direct benefits—indeed both now and prospectively—under the rights defined in the Operating Agreement. As a result, precedent teaches that he must pursue those rights under the arbitral process that is part and parcel of the Operating Agreement in which his claims are rooted. *Accord, e.g., Zurich American*, 417 F.3d at 687 (collecting cases).

## A.    Plaintiff Is Properly Required To Arbitrate Under the Estoppel Doctrine

Defendants' principal argument in favor of their motion is that the Operating Agreement's arbitration clause must apply to Plaintiff because he is asserting claims in reliance on the Operating Agreement. (D.E. 15 at 4-6.) The Seventh Circuit has recently stated that "[a] nonsignatory party is estopped from avoiding arbitration if it knowingly seeks the benefits of the contract containing the arbitration clause." *Zurich American*, 417 F.3d at 688 (citations omitted). Thus, in the arbitration context, a party may be estopped from asserting that an arbitration clause contained in a particular document is inapplicable when that same party simultaneously claims the direct benefit of that contract. *See id.*; *see also Hughes Masonry Co., Inc. v. Greater Clark County Sch. Bldg. Corp.*, 659 F.2d 836, 838 (7th Cir. 1981) (estopping a signatory to a contract containing an arbitration clause from maintaining that the arbitration clause did not apply to its

claim against a non-signatory when the agreement at issue formed the "very basis" of the claim). This estoppel doctrine exists to prevent a litigant from unfairly receiving the benefit of a contract while at the same time repudiating what it believes to be a disadvantage in the contract, namely the contractual arbitration provision. *See, e.g., American Bureau of Shipping*, 170 F.3d at 352 (holding that after a nonsignatory received benefits under a contract, it was estopped from claiming that the contract's arbitration clause was inapplicable to it); *see also Hughes Masonry*, 659 F.2d at 839 ("'In short, (plaintiff) cannot have it both ways. (It) cannot rely on the contract when it works to its advantage, and repudiate it when it works to (its) disadvantage.'") (punctuation in original; quoting *Tepper Realty Co. v. Mosaic Tile Co.*, 259 F.Supp. 688, 692 (S.D.N.Y. 1966)). The touchstone of this form of estoppel thus is whether the non-signatory has brought suit against the signatory premised upon the agreement that contains the arbitration clause at issue, thus seeking the agreement's direct benefits. *See, e.g., Zurich American*, 417 F.3d at 688; *American Bureau*, 170 F.3d at 353.

Caselaw reflects that it is important to verify that a non-signatory seeks direct benefits from the agreement containing the arbitration clause; it is not enough merely that the claims at issue have some logical nexus to the agreement, or that plaintiff seeks a result that indirectly relates to or benefits from the existence of the agreement. That need for appropriate caution, however, does not create any material question as to whether Plaintiff seeks a "direct benefit" from the Operating Agreement in the instant case. As explained below, it is clear that Plaintiff does.

The Court has carefully reviewed the Plaintiff's complaint, and it is fair to say that the Plaintiff's claims are fundamentally rooted in the rights and terms of the Operating Agreement.

11

For example, Plaintiff flatly asserts that he "has filed his claims against Defendants seeking a declaration that he owns an Economic Interest *pursuant to the . . . Operating Agreement of Intrinsic*." (D.E. 8 at 4 (emphasis added).) In this regard, Plaintiff asserts that he purchased his asserted Economic Interest in the Company "consistent with the terms of Section 7.5 of the Operating Agreement." (*Id.; see also id.* at 11 (asserting that, in connection with the sale, Plaintiff's son, Michael, properly notified Defendants in the fashion required by Section 7.5 of the Operating Agreement).) Plaintiff further asserts that the Company "failed to fairly meet Robert's offer as required by Section 7.5 of the . . . Operating Agreement," because the Company sought to impose conditions inconsistent with those "set forth in Article 9 of the . . . Operating Agreement." (*Id.* at 8.) Plaintiff asserts that a subsequent Company offer to purchase the Interest at issue was invalid because it was not properly advanced pursuant to "Sections 7.6(b) and 7.1(b)(iii) and 7.1(b)(ix) of the . . . Operating Agreement." (*Id.* at 8-9; *see also id.* at 9 (asserting that "Section 7.6(b) of the . . . Operating Agreement was not applicable to Intrinsic's right of first offer because, *inter alia*, Section 7.5 of the . . . Operating Agreement" instead controlled).)

In Count I, Plaintiff further demands timely cash distributions from the Company and the individual Defendants, "pursuant to Sections 5.4 and 6.7 of the . . . Operating Agreement," which distributions are to be "sufficient to pay his federal and state tax liability arising from" Plaintiff's asserted Economic Interest in Intrinsic. (*Id.* at 11; *see also id.* at 12 ("Section 5.4 of the . . . Operating Agreement provides that Intrinsic shall make cash distributions to each Interest Holder sufficient to pay the federal and state tax liability incurred by such Interest Holder and that such distributions shall be made not later than March 15 of the calendar year").) Plaintiff also demands access so as to be able to inspect the books and records of the Company, access to

which he claims entitlement under "Section 6.6 of the . . . Operating Agreement." (*Id.*)

Count II, the breach of fiduciary duty count, seeks to impose heightened fiduciary duties on Defendants Lamantia and Schendelman as a result of Plaintiff's asserted purchase of his son's Economic Interest in the Company. (*Id.* at 13.) In this regard, Plaintiff asserts that the individual Defendants owe him, *inter alia*, a duty "to abide by the terms of the . . . Operating Agreement." (*Id.* at 13.) Plaintiff claims that the individual Defendants violated this duty when they improperly "excluded [Plaintiff] from all information regarding Intrinsic, including information [Plaintiff] is [allegedly] entitled to review and/or receive pursuant to Sections 6.6 and 6.7 of the . . . Operating Agreement." (*Id.*)

Count III, the accounting demand, similarly asserts rights to Company information "pursuant to Sections 6.6 and 6.7 of the . . . Operating Agreement." (*Id.* at 15.) Plaintiff demands an accounting because of Intrinsic's alleged shortcomings in providing the corporate information to which Plaintiff asserts an entitlement to examine and review. (*Id.*)

In averring the factual foundation for his claim, Plaintiff does more than cite to the Operating Agreement in passing. He cites to the Operating Agreement repeatedly, and at times he even block quotes entire sections of the document. (*See, e.g., id.* at 9-10 (three paragraph long block quote of Section 7.5, entitled "Right of First Refusal Upon Voluntary Transfer").) There might be a legitimate debate at the margins about the centrality of a few of the less-significant citations, but most of them, and certainly the effect of them in the aggregate, can only lead to the conclusion that Plaintiff is seeking a direct benefit (indeed, multiple benefits, and on a present and future basis) from the Operating Agreement. He demands annual payments, now and into the future, and he demands the right to examine the central books and records of the Company.

13

He also asserts that, as a result of his asserted purchase of his son's Interest in the Company, the Company and the Defendant-owners owe him heightened fiduciary duties, to include the duty to "abide by the terms of the . . . Operating Agreement." (*Id.* at 13.) Under such circumstances— where Plaintiff seeks a direct benefit, through claims fundamentally grounded in asserted benefits and rights conferred by the Operating Agreement—precedent instructs that Plaintiff also must accept the Operating Agreement's specification that disputes of this sort concerning it must be resolved through arbitration. *See Hughes Masonry*, 659 F.2d at 839 ("'In short, (plaintiff) cannot have it both ways. (It) cannot rely on the contract when it works to its advantage, and repudiate it when it works to (its) disadvantage.'") (punctuation in original; quoting *Tepper Realty Co.*, 259 F. Supp. at 692)); *accord, e.g.*, *Zurich American*, 417 F.3d at 687-88.

This outcome is consistent with Seventh Circuit precedent, and the outcome also is consistent with substantial federal appellate authority from other circuits. For example, in *Int'l Paper Co.*, 206 F.3d 411, the Fourth Circuit taught that:

> [i]n the arbitration context, the doctrine [of estoppel] recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him. To allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act.

*Id.* at 418 (internal citation and quotation marks omitted; brackets in *Int'l Paper*). Applying this principle, the Fourth Circuit held that a non-signatory to an arbitration agreement was properly ordered to arbitration, under the doctrine of estoppel, where its claims arose from the agreement containing the arbitration clause at issue. *Int'l Paper*, 206 F.3d at 418. In *International Paper*, a

14

buyer of an industrial saw sued the manufacturer of the saw on the basis of a contract, which contained an arbitration clause, between the saw's distributor and manufacturer. *Id.* at 413. *International Paper* found that the distributor-manufacturer contract provided the factual foundations for the claims asserted by the non-signatory plaintiff against the signatory defendant. *Id.* at 418. Because plaintiff's "entire case hinge[d] on its asserted rights under the . . . contract, it [could] not seek to enforce those contractual rights and avoid the contract's requirement that 'any dispute arising out of' the contract be arbitrated." *Id.*; *see also id.* ("A nonsignatory is estopped from refusing to comply with an arbitration clause 'when it receives a direct benefit from a contract containing an arbitration clause.'") (quoting *American Bureau*, 170 F.3d at 353; further citations and internal quotation marks omitted).

Similarly, *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349 (2d Cir. 1999), recognized the same five situations where "non-signatories may be bound by arbitration agreements entered into by others" as the Seventh Circuit has done in cases such as *Zurich American. Id.*, 170 F.3d at 352. *American Bureau* applied the estoppel principle to bind non-signatory shipowners who sought to assert rights predicated on an agreement that contained an arbitration clause signed by the defendant. *See id.* at 353 ("A party is estopped from denying its obligation to arbitrate when it receives a direct benefit from a contract containing an arbitration clause.") (internal quotation marks and citation omitted). *American Bureau* has subsequently been cited approvingly by the Seventh Circuit. *See Zurich American*, 417 F.3d at 687 (citing *American Bureau*, 170 F.3d at 352); *id.* at 688 (citing *American Bureau*, 170 F.3d at 353).

By way of further example, in *Washington Mutual Fin. Group, LLC v. Bailey*, 364

15

F.3d 260 (5th Cir. 2004), the Fifth Circuit endorsed and quoted *verbatim* the extended reasoning of the Fourth Circuit in *Int'l Paper* that was block-quoted above. *See Washington Mutual*, 364 F.3d at 267-268 (quoting *Int'l Paper Co.*, 206 F.3d at 418). Applying this principle, the Fifth Circuit held that a non-signatory plaintiff was nonetheless required to arbitrate a dispute with a signatory defendant (the insurance company), when the claims of the non-signatory plaintiff "hing[ed] on rights arising from . . . loan and credit insurance transactions" effected through the agreements with the arbitration provisions. *Id.*, 364 F.3d at 267 n.5; *see also id.* at 267 (holding that arbitration was warranted "under the principle of equitable estoppel, which precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes as well"). In reaching this conclusion, the Fifth Circuit—which reversed a district court refusal to compel arbitration against the non-signatory—held that application of the estoppel doctrine was appropriate to prevent the non-signatory plaintiff from taking "inconsistent positions" in "suing based upon one part of a transaction that she says grants her rights while simultaneously attempting to avoid other parts of the same transaction that she views as a burden—namely the arbitration agreement." *Id.* at 268.[4]

Under this precedent, arbitration is appropriate. Seventh Circuit precedent and precedent of its sister circuits direct that Plaintiff, if he wishes to invoke the benefits of rights conferred by

---

[4]    Plaintiff repeatedly notes that he does not claim that he will have "Member" status going forward under the Operating Agreement. *See, e.g.*, D.E. 18 at 5 (conceding that Plaintiff did not "acquire a Membership interest."). While Plaintiff is correct that he did not acquire the right to become a "Member" of Intrinsic—because, under the Operating Agreement, such a transfer requires the "unanimous consent of the then-current Members" (*id.*, Ex. A at 10), which consent the Defendant-Members certainly have not given—that does not, with all respect, suggest that arbitration is inappropriate. Even if Plaintiff does not seek to invoke "Member" rights and status through this lawsuit, he does seek to invoke other significant rights under the Operating Agreement, including the right, as a putative Economic Interest Holder, to annual financial distributions (as defined in Section 5.4 of the Operating Agreement) and the right to inspect the core books and records of the Company (as defined in Sections 6.5 and 6.6). Under such circumstances, estoppel principles apply, as explained above.

16

the Operating Agreement, also must abide by the mechanism of arbitration, which is part and parcel of that same Operating Agreement.

### B. Plaintiff's Various Defenses To Arbitration Are Respectfully Rejected

1. The Caselaw Plaintiff Invokes is Inapposite

The limited authority Plaintiff offers does not suggest a different result. For example, *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657 (7th Cir. 2002), rejected the idea that a particular contract concerning one subject (*i.e.*, acquisition of ownership interests), which did not contain an arbitration clause, incorporated by reference a second and distinct employment agreement, which had an arbitration clause. *See id.* at 662 (describing the incorporation by reference issue as "the central controversy in this appeal"). That issue is not relevant here, however, as there is no incorporation by reference question presented. *See generally Zurich American*, 417 F.3d at 687 (collecting cases and defining estoppel and incorporation by reference as distinct bases by which a non-signatory can be compelled to arbitrate claims).

Furthermore, and contrary to Plaintiff's implicit suggestion, *Rosenblum* is consistent with the Seventh Circuit's recent teaching in *Zurich American*. The plaintiff in *Rosenblum* did not seek any direct benefit from the contract with the arbitration clause, as is the case here. Instead, the *Rosenblum* plaintiff sought a benefit called for by the acquisition agreement (*i.e.*, a monetary payment) that would have been due, at least according to his allegations, whether or not he ever agreed to stay on with the company under the terms set forth in the employment agreement. *See id.*, 299 F.3d at 663 (describing the two agreements as "separate, free-standing contracts," and adding that "[e]ach contract delineates rights and duties independent of the other and that pertain to a particular subject matter. One contract may be fully performed while the other is

17

breached."). Thus, while *Rosenblum* is a useful example of a materially different situation under the *Zurich American* analysis—that is, a situation where there merely is a logical connection or factual nexus between the plaintiff's claims and the agreement containing the arbitration clause, such that arbitration is not required—this case presents a "direct benefits" case which, under *Zurich American* and extensive other federal appellate precedent, calls for arbitration of Plaintiff's claims.

Plaintiff's citation of *Grundstad v. Ritt*, 106 F.3d 201 (7th Cir. 1997), and *Laborers' Int'l Union of North America, Local Union 309, AFL-CIO v. W.W. Bennet Construction Co.*, 686 F.2d 1267 (7th Cir. 1982), also does not suggest a different result. In *Grundstad*, the guarantor of a party to a noncompete agreement brought suit to enjoin an arbitration proceeding that a signatory to the noncompete agreement had initiated to enforce the guarantor's alleged monetary liability via the guarantee. *Id.*, 106 F.3d at 202-203. *Grundstad* held that the guarantor did not unambiguously express his intent to be bound by the arbitration clause contained within the noncompete agreement and therefore summary judgment in favor of arbitration was inappropriate. *Id.* at 205.

Putting aside the fact that the decision appears to have merely reversed a grant of summary judgment because of an open factual question (*see id.* (reversing grant of summary judgment and remanding case for further proceedings)), the case involved a materially distinct situation from the instant case. Specifically, the case involved a signatory-plaintiff in the initial dispute (*i.e.*, Mr. Ritt, who claimed that others had failed to pay him as required by the noncompete agreement) who invoked the benefits of a distinct guaranty agreement and sought to bind a non-signatory defendant (Mr. Grundstad, the asserted guarantor) against his will to the

arbitral process called for by a non-competition agreement. *Id.* Thus, the non-signatory through the litigation sought no direct benefits from the agreements at issue—unlike the case here, where Plaintiff certainly does seek direct benefits under the Operating Agreement, and therefore is subject to the estoppel doctrine concerning the remainder of the Operating Agreement. In addition, *Grundstad* is fundamentally another incorporation-by-reference case, and its analysis focuses on the two-agreement nature of the issues presented there. *See, e.g., id.* at 204-05 & n.4. As discussed above, incorporation by reference issues simply are not present here.

     *Laborers' International*, 686 F.2d 1267, presents a similar scenario to *Grundstad*, albeit more factually complicated. It is also does not suggest a different result. First, *Laborers' International* was a case about a subject far afield from the present dispute. The Seventh Circuit framed the case as presenting a "single issue"—namely, "whether a district court may enforce a provision of a collective bargaining agreement calling for bipartite arbitration between the signatories where the defendant employer contends that this dispute is jurisdictional between the plaintiff union and a second union and should not be submitted to arbitration unless all parties involved in the dispute participate." *Id.*, 686 F.3d at 1270. This issue of labor law, and the various labor law doctrines that it implicates—*see generally id.* at 1270-76 (extensively discussing various labor law doctrines)—are not present here, nor were they present in the extensive body of federal appellate precedent such as *Zurich American* and the other cases cited above.

     In addition, *Laborers' International* is factually distinct. In that case, a union ("Laborers") representing a contractor's employees sought specific performance of an arbitration clause contained in the collective bargaining agreement between the union's members and the

contractor. *Id.* at 1269. The contractor had subcontracted certain work on the construction

project at issue to a subcontractor ("O'Dell"), who in turn hired certain members of a separate

union ("Plumbers"). *Id.* While the collective bargaining agreement between Laborers and the

contractor contained an arbitration clause, Plumbers and O'Dell were not signatories to that

agreement. *Id.* The contractor answered Laborers' complaint and filed a third-party complaint

against O'Dell and Plumbers. *Id.* Plumbers then filed a cross-complaint against Laborers,

O'Dell, and the contractor, "claiming that all parties were bound to resolve jurisdictional disputes

in a multipartite arbitration pursuant to the procedures established in the Constitution of the

Building and Construction Trades Department of the AFL-CIO." *Id.* at 1269-1270. The Seventh

Circuit concluded that O'Dell, a non-signatory contractor, was not bound to arbitrate in a

consolidated proceeding involving the contractor and the unions. (*Id.* at 1275.) However, in

*Laborers' International*, the nonsignatory subcontractor, O'Dell, was not pursuing any claims at

all, and it certainly was not seeking to enforce the collective bargaining agreement between

Laborers' International and the contractor. *Id.* at 1269. Therefore, the equitable estoppel

doctrine was not relevant, and it was not discussed in the opinion at all.

To be sure, a single snippet of *Laborers' International*, the recognition that "one who has

not agreed to arbitrate" will generally not "be forced to arbitrate," *id.* at 1274, is a statement of a

general principle that must and has been considered here. That general principle, however, like

many, is qualified by certain exceptions. *See, e.g., Zurich American*, 417 F.3d at 687-88. This

case, for all of the reasons explained above, implicates the estoppel exception, and arbitration is

therefore appropriate. *See, e.g., id.* (collecting cases).

2.      Whether Plaintiff Received Consideration for the Arbitration Clause is Not
        Germane

Plaintiff next opposes Defendant's motion for a stay by arguing that because he did not

receive "[c]onsideration for the [a]rbitration [c]lause" in the Operating Agreement, he cannot be

bound by it. (D.E. 18-1 at 6.) This does little to advance Plaintiff's opposition to a stay pending

arbitration in the face of the equitable estoppel doctrine. The very point of equitable estoppel as

it relates to arbitration provisions is to avoid nonsignatories directly benefitting from a contract

containing an arbitration clause while at the same time seeking to avoid the arbitration clause

contained in that selfsame contract. *See, e.g.*, *Deloitte Noraudit A/S v. Deloitte Haskins & Sells,*

*U. S.*, 9 F.3d 1060, 1064 (2d Cir. 1993). As described above, equitable estoppel is appropriate in

cases where the nonsignatory may not have received consideration at the time the contract was

created, but nonetheless sought the "direct benefit" of the contract through the relevant litigation

while simultaneously attempting to avoid the contract's arbitration clause. *See Zurich American*,

417 F.3d at 687-88; *Washington Mutual*, 364 F.3d at 268; *Int'l Paper*, 206 F.3d at 418; *American*

*Bureau*, 170 F.3d at 353. Here, Plaintiff is seeking to enforce an alleged transfer of his son's

Economic Interest in Intrinsic that can only be accomplished pursuant to the terms of the

Operating Agreement. (D.E. 8 at 11; see also D.E. 18, Ex. A, Section 7.2(a) (requiring any

transfer of Interest in the Company to be effected in conformity with the conditions defined

therein). Plaintiff is seeking to force Defendants to "abide by the terms of the Operating

Agreement" and to receive an "accounting" pursuant to the Operating Agreement. (D.E. 8 at 13,

15.) Regardless of whether Gersten received consideration for the arbitration clause of the

Operating Agreement at the time his son signed it, the "direct benefits" he seeks from the

Operating Agreement now estop him from inequitably claiming that the same agreement's arbitration clause does not apply to him. *Id.*[5]

Relatedly, Plaintiff asserts that "[i]t would be a ludicrous result if the Operating Agreement were interpreted to provide that if Defendants had brought a claim against Gersten, they would not be required to arbitrate; yet, because [Plaintiff] bought [sic] a claim against them, he is forced to arbitrate." (D.E. 18-1 at 6.) With all respect, this claim is substantially in error. If Defendants had sued Plaintiff and alleged a right or "direct benefit" under the terms of the Operating Agreement—for example, if Defendants had asserted that Plaintiff was bound under Section 4.3 of the Operating Agreement to contribute his alleged share of a required capital contribution to the Company[6]—Plaintiff surely would have been entitled under equitable estoppel doctrine to have compelled Defendants to arbitrate that claim. *See, e.g., MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947-948 (11th Cir. 1999); *American Bureau*, 170 F.3d at

---

[5]    The case Gersten cites in support of his argument, *Vassilkovska v. Woodfield Nissan, Inc.*, 830 N.E.2d 619, 624 (Ill. App. Ct. 2005), fails to bolster his argument. *Vassilkovska* found that the arbitration agreement at issue was a separate stand-alone contract and therefore required consideration for arbitration. *Id.* Moreover, it is well recognized that "[a] contract does not lack mutuality merely because its obligations appear unequal or because every obligation or right is not met by an equivalent counter obligation or right in the other party." *Piehl v. Norwegian Old People's Home Soc. of Chicago*, 469 N.E.2d 705, 706 (Ill. App. Ct. 1984) (citation omitted).

[6]    Section 4.3 of the Operating Agreement, entitled "Additional Capital Contributions," states:

> If the Members determine at any time that the Company requires an additional Capital Contribution, each Interest Holder shall contribute his or her share of the required Capital Contribution. An Interest Holder's share of the additional Capital Contribution shall be equal to the product obtained by multiplying the Interest Holder's Percentage Interest by the total additional Capital Contribution required. Within thirty (30) days after the Members have determined the amount of additional Capital Contribution required, each Interest Holder shall pay the Interest Holder's share, in cash or by check, to the Company.

(D.E. 8, Ex. A at 6.)

353; *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320-321 (4th Cir. 1988); *Hughes Masonry*, 659 F.2d at 838-39 & 841 n.9. Plaintiff is not subject to some uneven playing field: he has asserted claims fundamentally predicated on the Operating Agreement; that agreement calls for arbitration, which is appropriate concerning the litigation of such claims. If the tables were turned, Plaintiff could similarly compel arbitration of the Defendants' claim(s).[7]

       3.      Arbitration Is Not Inappropriate Because Defendants Do Not Concede The Merits of Plaintiff's Claims

Finally, Plaintiff argues that because Defendants maintain that Plaintiff's asserted claims are baseless (*i.e.*, that Plaintiff does not properly have rights under the terms of the Operating Agreement), Defendants cannot successfully stay this matter in favor of arbitration. (D.E. 18-1 at 5). This assertion is not well taken.

It is firmly established that the question of whether a claim is properly subject to arbitration is distinct from the question of whether the various claims, counterclaims, defenses, etc., of the parties are meritorious or not. *See, e.g., Hawkins*, 338 F.3d at 807 ("In analyzing a motion to compel arbitration, courts must consider only the issues relating to arbitrability.") (citing *We Care Hair Dev., Inc.*, 180 F.3d at 844). As a result, a litigant must, if arbitration is otherwise justified, resolve the merits in arbitration—even when the litigant claims far more serious issues, going to the foundation of the relevant contract, than the claim that one's adversary is actually mistaken in his putative merits defense. *See, e.g., Colfax Envelope Corp. v.*

---

[7]    This reciprocity also reveals the deficiency of Plaintiff's "no consideration" contention discussed above. *See Matterhorn, Inc. v. NCR Corp.*, 763 F.2d 866, 869 (7th Cir.1985) ("If the agreement of one party to arbitrate disputes is fully supported by the other party's agreement to do likewise, there is no need to look elsewhere in the contract for consideration for the agreement to arbitrate . . .") (citations omitted).

*Local No. 458-3M, Chicago Graphic Communications Int'l Union, AFL-CIO*, 20 F.3d 750, 754 (7th Cir.1994) (courts "will not allow a party to unravel a contractual arbitration clause by arguing that the clause was part of a contract that is voidable" or that it should be rescinded) (citations omitted); *Sokaogon Gaming Enter. Corp. v. Tushie-Montgomery Assoc., Inc.*, 86 F.3d 656, 659 (7th Cir. 1996) ("Although the arbitration clause is contained in a contract that the tribe contends is illegal, the tribe rightly does not argue that the illegality of the contract infects the arbitration clause.") (collecting cases); *Sweet Dreams*, 1 F.3d at 641 ("[A] dispute, which has as its object the nullification [or rescission] of a contract, 'arise[s] out of' that same contract" and, thus, is arbitrable.).

Moreover, federal precedent reflects that courts, when assessing whether the plaintiff is advancing allegations that implicate issues such as the applicability of the equitable estoppel doctrine regarding arbitration clauses, look to the allegations in the plaintiff's complaint. *See, e.g., MS Dealer*, 177 F.3d at 947-48. Put differently, courts have not required a movant, as the price of invoking applicable federal arbitration precedent, to concede substantive liability regarding relevant issues concerning the claims; the merits questions instead should be resolved in arbitration.[8]

For the reasons stated above, Plaintiff is properly required to arbitrate the claims he advances here. That result is consistent with Seventh Circuit precedent, and it is also consistent

---

[8]     This approach—*i.e.*, looking to the allegations in the plaintiff's complaint and the operative arbitration clause—also makes substantial practical sense. Arbitrability issues must be sorted out sooner rather than later in a case, lest the party seeking to compel arbitration be seen to have waived the issue. Furthermore, the underlying purpose of arbitration is also to provide, where applicable, a forum for a speedy and typically cheaper resolution of a dispute without protracted in-court proceedings. As a result, the propriety of arbitrability would seem to be fairly addressed, at least typically, on the basis of the plaintiff's allegations and the language of the operative arbitration clause, and not on the basis of merits issues that might not fairly be resolved until after extensive discovery was completed.

with the precedent of sister circuits.

## CONCLUSION

For the foregoing reasons, Defendant's motion to stay proceedings pending arbitration is granted. (D.E. 14.) Under applicable precedent, Plaintiff must pursue the claims he seeks to advance against the Defendants in arbitration.

So Ordered.

_Mark Filip_
Mark Filip
United States District Judge
Northern District of Illinois

Dated: _8-10-06_